# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
June 18, 2014 Session

## ELIZABETH ANN MORROW GRANOFF v. ANDREW SCOTT GRANOFF

**Appeal from the Circuit Court for Jefferson County**
**No. 19,472     Richard R. Vance, Judge**

---

### No. E2013-02598-COA-R3-CV-FILED-SEPTEMBER 26, 2014

---

This action arose over the proposed post-divorce sale of improved real property in which both parties held an ownership interest pursuant to the terms of their marital dissolution agreement, entered by the trial court with the parties' divorce judgment in May 2006. The real property at issue consisted of a luxury estate situated on approximately twenty-six acres of lakeside property in White Pine, Tennessee. Following the parties' filing of competing motions for contempt, respectively alleging each party's lack of cooperation in efforts to sell the marital residence, the parties announced an agreement in December 2008 that the wife would "assume the right to list, market, show and sell" the marital residence while the husband was allowed to continue living there. This agreement was ultimately memorialized by the trial court in an order entered September 6, 2011. Upon negotiating an offer to purchase the marital residence for $925,000.00 in August 2013, the wife filed a motion to approve the sale at that price. Following a bench hearing, at which the husband opposed the sale and questioned Wife's authority to enter into the purchase and sale contract, the trial court granted the wife's motion and approved the sale of the marital residence for the amount of $925,000.00. The court also granted Wife authority to convey the real property upon her signature alone, ruling that Wife had acted in accordance with the authority awarded her in the previous order. The husband appeals. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., C.J., and D. MICHAEL SWINEY, J., joined.

William A. Mynatt, Jr., Knoxville, Tennessee, for the appellant, Andrew Scott Granoff.

James Richard Scroggins, Jefferson City, Tennessee, and Lisa A. White, Knoxville, Tennessee, for the appellee, Elizabeth Ann Morrow Granoff.

**OPINION**

I. Factual and Procedural Background

The plaintiff, Elizabeth Ann Morrow Granoff ("Wife"), and the defendant, Andrew Scott Granoff ("Husband"), were married twenty-one years prior to the entry of a final judgment of divorce on May 16, 2006. At the time of the divorce proceedings, the parties were partners in Granoff Properties, LLC, and owned significant assets. At issue in this appeal is the disposition of the marital residence ("the Property"), a luxury estate situated on twenty-six acres bordering Douglas Lake in White Pine, Tennessee, and including an approximately 9,000-square foot home, a guest house, a swimming pool, and tennis courts. At the time of the judgment for divorce, the parties' ownership interest in the Property was not encumbered by mortgage debt.

The parties' marital dissolution agreement ("MDA"), incorporated into the final judgment of divorce, provided as to the Property:

> **REAL PROPERTY**: The parties own a residence and land located at 390 Highway 113, White Pine, Tennessee 37980, as tenants by the entireties. The land shall be immediately placed for sale. Wife shall be given a Trust Deed to secure an interest in the property of $460,000.00 or 30% of the proceeds, whichever is higher. If the house and land are not sold within four years of the date of the entry of the Final Judgment of Divorce, Husband shall have an additional two years to sell the property but shall begin paying a monthly payment to [W]ife equal to a monthly portion of the prime interest rate on the $460,000.00, should Husband fail to make a payment as required, Wife shall have the right to demand an immediate auction subject to the same conditions set forth herein regarding an auction of the property. If the house has not sold in six years from the date of entry of the divorce it shall be auctioned by a reputable auction company with a mutually agreeable reserve. At the time of any nonauction sale, after the payment of any expenses of said sale, the Wife shall receive (30%) of the net proceeds or $460,000.00, whichever is greater. Should the property require an auction, the parties shall divide the proceeds of the auction, after the payment of the expenses of the sale evenly between them. Until such time as the property is sold, Husband shall have the right to reside in the marital residence and shall be responsible for the reasonable maintenance and upkeep as well as the property tax and

-2-

insurance. The Husband may decide to auction the home at any time with a reputable auction [company] and a mutually agreeable reserve.

Parties agree that Wife's Deed of Trust should not be subordinated to any other debt.

Husband and Wife will cooperate so that Husband may borrow sufficient funds to pay the property tax lien now existing against the residence and the 2005 property taxes associated with the residence.

Husband continued to reside on the Property throughout the proceedings. He and his new wife resided on the Property at the time of trial in the instant matter.

Following entry of the divorce judgment, Wife filed a petition for contempt against Husband on August 25, 2006. As relevant to the sale of the Property, Wife alleged that Husband had failed to pay the property taxes, maintain insurance covering the Property, and keep her informed of his efforts to sell the Property. She requested that the trial court allow her access to the house to prepare it for sale and that she be allowed to secure an appropriate auctioneer or realtor to finalize the sale of the Property. Husband filed an answer, acknowledging as to the Property that the taxes were in arrearage by one year and that there was no insurance coverage on the Property. He asserted that he intended to pay the property tax arrearage in full and that insurance could not be obtained because the Property was located too far away from a fire station. He added that construction of a fire station was in process, which upon completion, would allow for insurance coverage of the Property. Husband also filed a counter-petition against Wife for contempt, alleging, as relevant to the Property, that Wife had filed the petition for contempt as a form of harassment.

On January 19, 2007, the trial court entered an Order incorporating and approving an agreement that the parties had announced before the court on November 27, 2006. In great part, this order addressed rental property located on Eleanor Street in Knox County, Tennessee ("Eleanor Street Property"), which had been awarded to Wife in the judgment for divorce and on which she alleged Husband had failed to provide her with documentation of ownership or maintain mortgage payments. The January 2007 agreed order, *inter alia*, required Husband to pay a mortgage arrearage on the Eleanor Street Property by obtaining financing on the Property at issue in this appeal. The order provided in pertinent part:

The husband shall be solely responsible for the mortgage arrears on the wife's above-referenced real property on Eleanor Street in Knox County, Tennessee, up to Ten Thousand ($10,000.00) Dollars. The husband shall hold wife harmless for said debt. He shall immediately attempt to obtain financing

on the marital residence to pay this outstanding debt on the Eleanor Street property and to pay all outstanding property taxes on the marital residence. Should husband be unable to obtain the financing herein ordered prior to the foreclosure of the Eleanor Street property, he shall then pay the wife Fifty Thousand ($50,000.00) Dollars as soon as possible with the remaining Twenty Thousand ($20,000.00) Dollars at the sale of the marital residence. This Seventy Thousand ($70,000.00) Dollars will be compensation to the wife for the loss of the rental property to foreclosure, should same occur. The wife will be awarded a judgment against the husband for Seventy Thousand ($70,000.00) Dollars should the Eleanor Street foreclosure occur.

The January 2007 order also required Husband to obtain a homeowner's insurance binder, retroactive to fifteen days following the announcement of the parties' agreement in November 2006. The order reserved issues of contempt and Wife's request for attorney's fees.

Subsequently, following a hearing conducted on April 17, 2007, the trial court entered an Order on June 15, 2007, taking notice that the Eleanor Street Property had been foreclosed and could no longer be valued as Wife's asset. The court ordered Husband, *inter alia*, to pay Wife the amount of $50,000.00 toward the value of the Eleanor Street Property within thirty days of the April 17, 2007 hearing. As to the Property at issue in this appeal, the court ordered Husband to provide Wife with a copy of proof of insurance covering the Property. Husband also was ordered to obtain refinancing on the Property, as the sole obligor if possible and with Wife's cooperation in the event he was unable to solely refinance. The court specifically directed that the parties were "to keep one another informed of the progress in selling the home." The court also awarded to Wife attorney's fees in the amount of $1,500.00.

Less than six months later, on December 4, 2007, Wife filed a "Petition for Contempt and for Sale of Real Property," requesting, *inter alia*, full authority to list the Property for sale and to contract for sale of the Property by auction. Wife alleged in regard to the Property that Husband had willfully refused to pay her the funds ordered by the trial court in its June 2007 order, refused to maintain insurance coverage on the Property, failed to pay taxes on the Property, and failed to keep her informed regarding efforts to market and sell the Property. Husband filed a response and a petition for contempt against Wife, averring that inasmuch as he had failed to perform as ordered by the trial court, his failure was the result of Wife's failure to cooperate with him in obtaining financing. Husband again asserted that Wife's petition for contempt constituted "harassment by Court action." He denied failing to inform Wife of his efforts to market and sell the Property.

On December 15, 2008, the parties announced an agreement to the trial court, which was subsequently memorialized in a written order nearly three years later on September 6, 2011.[1] It is undisputed that the September 6, 2011 order accurately represents the December 15, 2008 agreement. Regarding the Property at issue, the trial court ordered in pertinent part:

1.	The wife, Elizabeth Ann Morrow Granoff, shall assume the right to list, market, show and sell the real property in Jefferson County, Tennessee consisting of the marital residence situated upon approximately twenty-six (26) acres with improvements. The husband shall continue to occupy the residence and he shall cooperate fully with the wife with regard to showing the premises and marketing the premises for sale. The wife shall have full access to come upon the property, to show the property, inspect the property, and otherwise participate in the usual and customary acts associated with sale.

2.	In the event that the real property consisting of the marital residence and approximately twenty-six (26) acres with improvements does not sell pursuant to the listing of said property on or before August 1, 2009, the wife shall select a date during the month of October 2009 for the property to be sold at auction with an auctioneering firm to be agreed between the attorneys of the parties. The husband shall comply with previous orders relative to upkeep, maintenance, payment of real estate taxes and maintaining sufficient insurance with regard to the property.

3.	The wife shall assume responsibility for attempting to secure a one (1) year loan with monthly interest only and principal being payable on the anniversary date of the loan in an amount up to sixty thousand dollars ($60,000.00) with the loan proceeds utilized to satisfy past-due taxes, penalty and interest, and the expense of insurance premium for the marital residence and real property. The husband shall cooperate fully with the wife in her attempts to secure the loan and he shall sign notes, instruments, or other documents necessary and associated with applications and the securing of the loan. The funds borrowed shall be

---

[1] During his opening statement at trial, Wife's counsel explained that the transcript of the December 2008 hearing at which the agreement was announced had been filed with the trial court but that "we all just sort of fell asleep and didn't get that order entered." The transcript of the December 2008 hearing is not included in the appellate record. The transcript is included, however, as an appendix in Husband's principal brief, and Wife in her responsive brief specifically does not dispute the transcript's accuracy. The record contains no further explanation of the nearly three-year delay between the announced agreement and entry of the order.

repaid from funds of the husband upon sale of the real property and marital residence. He shall continue to be responsible for all of the expenses associated with taxes, maintenance, insurance and upkeep of the marital residence that he occupies pending sale.

Despite the provision in the above agreed order for auction of the Property, the home was never offered at auction because the parties could not agree on a reserve price. Prior to the agreement, the Property had been listed for as much as $3,100,000.00 and as little as $1,700,000.00, but no offers to purchase had been tendered. Wife testified that following the December 2008 agreement, Husband refused to agree to a minimum reserve price below $1,700,000.00. Wife explained that she believed the Property would not sell at the minimum reserve upon which Husband insisted and that she would not agree to incur the expenses of an auction unless the minimum reserve price could be reduced. Wife acknowledged that she did not pursue further negotiation with Husband regarding a minimum reserve price for auction purposes.

In May 2011, Wife contracted to list the Property with Johnnie Creel, a real estate broker and luxury home specialist who testified at trial. Ms. Creel first listed the Property at a price of $1,600,000.00, and it was her understanding that the parties agreed to that price upon her recommendation. The listing price was subsequently reduced twice with Wife's approval, first to $1,550,000.00 and finally to $1,250,000.00. It is undisputed that Husband had made known his objection to reducing the price below $1,600,000.00, and neither Ms. Creel nor Wife consulted him regarding the subsequent price reductions. In August 2013, Wife received an offer to purchase the Property in the amount of $875,000.00. Acting through Ms. Creel, Wife sent a counter-offer in the amount of $1,088,000.00, which the purchasers rejected. Wife eventually tendered the potential purchasers a counter-offer in the amount of $925,000.00, subject to approval by the trial court. The purchasers accepted that counter-offer. It is undisputed that Wife's negotiation with these potential buyers constituted the only serious offer and negotiation in the nearly eight years the parties had been attempting to sell the Property. Husband acknowledged at trial that he had received no offers to purchase the Property during the years that he was managing the marketing and selling efforts. Wife indicated that she had received only one other offer, which at $400,000.00, she had rejected as too low to consider.

On August 28, 2013, Wife filed a motion to approve the sale of the Property in the amount of $925,000.00. She attached to this filing an "Amounts Payable to the Wife by the Husband from Marital Residence Sale," setting forth amounts claimed as owed to her by Husband pursuant to previous court orders. By Wife's calculations, these amounts included $70,000.00 associated with the foreclosure on the Eleanor Street property and payable to Wife pursuant to the June 15, 2007 order; unspecified amounts Wife previously paid by

securing loans to pay for past-due taxes, penalties, interest, and insurance on the marital residence; monthly payments, pursuant to the MDA, that Husband was to begin paying Wife four years following the divorce judgment, with a total calculated at $49,286.40; a loan acquired by Wife at Husband's request to pay for a 2009 repair to the swimming pool liner at the Property with a principal owed of $34,500.00 and total with interest owed of approximately $52,000.00. Wife also averred that Husband had again failed to pay taxes on the Property, which had accrued in total to $9,523.36. On appeal, Husband does not dispute the amounts owed to Wife pursuant to previous court orders.

Following a hearing conducted on October 16, 2013, the trial court granted Wife's motion in full and recognized her authority to sell the Property, approving the proposed sale in the amount of $925,000.00 and vesting Wife with the right to convey the Property "by her signature alone." Husband timely appealed.

Husband subsequently filed a motion for relief pending appeal, requesting a stay of enforcement of the judgment pursuant to Tennessee Rule of Civil Procedure 62.03. Following a hearing conducted on November 18, 2013, the trial court denied Husband's motion. During the pendency of the appeal, this Court granted a motion filed by Wife in May 2014 for consideration of the post-judgment fact, also stipulated to by Husband, that the purchase and sale contract for which Wife had sought approval had expired and was not renewed by the potential purchasers. We determine that because the trial court in its final order vested Wife with the right to convey the Property, the appeal remains viable despite the termination of the purchase and sale contract.[2]

---

[2]Although Wife does not urge this Court to do so, she raises the threshold consideration on appeal of whether we might interpret the judgment allowing the sale as less than a final judgment due to the competing petitions for contempt filed throughout the proceedings. Upon careful and thorough review of the record, we conclude that the October 30, 2013 order from which Father appeals is a final, appealable judgment inasmuch as it resolved all issues before the trial court at the time of its entry. *See* Tenn. R. App. P. 3. The agreed order previously entered September 6, 2011, pursuant to the parties' December 2008 agreement, specifically reserved all contempt issues. The final order, however, followed an evidentiary hearing conducted by the trial court and was clearly intended by the court as a final disposition of the Property at issue. Neither party questioned the finality of the October 30, 2013 order to the trial court, and neither party filed a motion to alter or amend the judgment pursuant to Tennessee Rule of Procedure 60.02. Accordingly, we conclude that the parties abandoned their competing contempt claims brought prior to that point in the proceedings. As for a post-judgment motion filed by Wife with the trial court during the pendency of this appeal, in which she requests that the trial court require Husband to fulfill obligations previously imposed, the motion is premature inasmuch as jurisdiction over this matter will return to the trial court only upon remand from this Court. *See* Tenn. Code Ann. § 21-1-810 (2009); *Parish v. Marquis*, 137 S.W.3d 621, 624 (Tenn. 2004).

## II.  Issues Presented

Husband presents three issues for our review, which we restate as follows:

1.      Whether the trial court erred by approving the sale of the Property in the amount of $925,000.00.

2.      Whether the trial court erred by finding that Wife had acted in good faith and with sole vested authority to convey the Property when she marketed and accepted an offer to purchase said Property.

3.      Whether the trial court erred by failing to protect the value of the entire marital estate.

## III.  Standard of Review

We review a non-jury case *de novo* upon the record, with a presumption of correctness as to the findings of fact unless the preponderance of the evidence is otherwise.  *See* Tenn. R. App. P. 13(d); *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000).  We review questions of law, including those of statutory construction, *de novo* with no presumption of correctness. *Bowden*, 27 S.W.3d at 916 (citing *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 924 (Tenn. 1998)); *see also In re Estate of Haskins*, 224 S.W.3d 675, 678 (Tenn. Ct. App. 2006).  The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary.  *See Morrison v. Allen*, 338 S.W.3d 417, 426 (Tenn. 2011); *Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

Marital dissolution agreements are contractual and, once approved by the trial court, "become legally binding obligations on the parties."  *Long v. McAllister-Long*, 221 S.W.3d 1, 9 (Tenn. Ct. App. 2006) (explaining that with the two "notable exceptions" of child support and alimony, which remain modifiable by the courts, "the agreements in a marital dissolution agreement are enforceable contract obligations.").  We review issues of contract interpretation *de novo*.  *See Dick Broad. Co., Inc. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 659 (Tenn. 2013).  As this Court has previously explained:

In resolving a dispute concerning contract interpretation, our task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contract language.  *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 889-90 (Tenn. 2002) (citing *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999)).  A determination of

-8-

the intention of the parties "is generally treated as a question of law because the words of the contract are definite and undisputed, and in deciding the legal effect of the words, there is no genuine factual issue left for a jury to decide." *Planters Gin Co.*, 78 S.W.3d at 890 (citing 5 Joseph M. Perillo, *Corbin on Contracts*, § 24.30 (rev. ed. 1998); *Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001)). The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern. *Planters Gin Co.*, 78 S.W.3d at 890. The parties' intent is presumed to be that specifically expressed in the body of the contract. "In other words, the object to be attained in construing a contract is to ascertain the meaning and intent of the parties as expressed in the language used and to give effect to such intent if it does not conflict with any rule of law, good morals, or public policy." *Id.* (quoting 17 Am.Jur.2d, *Contracts*, § 245).

*Kafozi v. Windward Cove, LLC*, 184 S.W.3d 693, 698 (Tenn. Ct. App. 2005).

### IV. Approval of Sale of Real Property

Husband contends that the trial court erred by approving the sale of the Property in the amount of $925,000.00 because (1) Wife failed to establish this price as a fair market value and (2) the court failed to consider the effect of this price upon the equitable division of the marital estate. Wife contends that the trial court properly approved sale of the Property at $925,000.00 because competent testimony established that after nearly eight years on the market and a downturn in the economy, $925,000.00 was a reasonable market value for the Property and neither the MDA nor the December 2008 agreement provided for a minimum purchase price. We conclude that the evidence does not preponderate against the trial court's approval of the $925,000.00 purchase price as reasonable under the circumstances of the proposed sale.

As this Court has previously explained:

The value of marital property is a fact question. Thus, a trial court's decision with regard to the value of a marital asset will be given great weight on appeal. In accordance with Tenn. R. App. P. 13(d), the trial court's decisions with regard to the valuation and distribution of marital property will be presumed to be correct unless the evidence preponderates otherwise.

The value of a marital asset is determined by considering all relevant evidence regarding value. The burden is on the parties to produce competent

evidence of value, and the parties are bound by the evidence they present. Thus the trial court, in its discretion, is free to place a value on a marital asset that is within the range of the evidence submitted.

*Wallace v. Wallace*, 733 S.W.2d 102, 107 (Tenn. Ct. App. 1987) (internal citations omitted).

In granting Wife's motion to approve the sale, the trial court made specific findings of fact, subsequently incorporated into its written order, stating in pertinent part:

The Court has listened very carefully and followed the testimony and considered the testimony of the witnesses, the statements and arguments of counsel and the entire record in this cause.

This is a longstanding dispute. The point of contention, unfinished business of a divorce that was granted some eight years ago. And that is at the time it was understood that the property would be, the home would be sold and that the proceeds would be divided.

The Court recalls that for a period of time Mr. Granoff was given the opportunity and obligation to market and try to sell the home. Nothing ever happened, no buyer was ever produced.

At a point in time some four years ago, three years ago, the Order was filed in September of 2011, the hearing was before that, the Transcript was made. Because of the inability of Mr. Granoff to produce a buyer or do anything that resulted in the sale of the home, even a potential buyer, the Court did grant Ms. Granoff the power to market and sell the home.

The first issue that was drawn here today was whether or not she had the authority to do that. The plain language of the Court's Order answers that and says she did. The Court gave her the authority to sell the home.

Under that Order she could have signed the deed, closed the sale and not come into Court. She has asked this Court to approve that sale.

In saying that she had the authority to sell, the Court still has the authority to look at the reasonableness or conduct or reasonableness of the efforts to market it and sell it, and the reasonableness of the sale price.

In looking at the history this home was valued at substantially more than what it's being sold for today. And that's true of many homes in the country, in this area. It was testified to by the realtors and brokers who testified that the economy has caused homes that maybe cost a great deal more to be sold for less money. We have to deal with what we have today.

And what we have today is a home that's been on the market for eight years. For the past several years the Court finds that it was aggressively marketed by Ms. Creel, through her efforts, through marketing tools, Internet, publications, multiple listings, fliers, e-mails, other brokers, and has shown the house several times.

But the result has been only two offers, one of which was ridiculously low, and that's a legal term, ridiculously low, $400,000.00. And obviously it was not even considered.

The current offer is $925,000.00. Again this is less than what either of these parties ever wanted to sell this house for. It is to Ms. Granoff's advantage to maximize the sale price.

The more it sells for the more she gets. To Mr. Granoff's advantage, the more it sells for the more he gets. He couldn't produce a buyer in the years that he had the authority to market it. This is all that's out there.

The testimony of the realtor and broker both indicate that this sale price is within the range of what this house could be expected to sell for at an auction. Again, there's no other buyer in sight, hasn't been over the time that Ms. Granoff, since she was given, granted the authority to sell the home, has exercised good faith.

She wants to sell the house and of course she wants to gain her portion of the bargaining, that is the divorce settlement entirely that she waited many years for.

The longer the house is not sold the greater the existing debt is. One particular loan was $38,000.00, it's now $55,000.00. They keep going up. Taxes are to pay now. Interest accrues on these debts.

Mr. Granoff has had the benefit of the rental value of this home for some eight years, he's lived there and no rent. I don't know what the rent

would be when a home is worth $925,000.00, much less a Million and a Half. But I would say it's a substantial amount, his benefit that he has derived living there and being in possession of the home.

The value of the property in divorce cases is difficult to[;] sale after the divorce implies a forced sale. This process has gone some eight years.

Oftentimes neither party knows the full value, when a property is sold as a result of divorce. It was pointed out by the witnesses, the economy, it was mentioned by Mr. Granoff, and this is a legitimate concern to anyone who is trying to sell any property on any basis over the past few years. The economy has been such that it's difficult to sell property, difficult to find buyers.

This is the only buyer in sight, the only one that's been in sight in eight years anywhere that came anywhere close to what this property could be worth. The longer it sits there the more maintenance.

It has been mentioned tens of thousands of dollars has been spent, tens of thousands will continue to have to be spent to maintain the property, so long as it's not sold. That simply adds to the burden of these parties.

So for all these reasons the Court finds that Ms. Granoff has found a buyer through her efforts and diligence, work with the realtors, found the best possible price that could be obtained for the property. Under all those circumstances the Court finds that that sale price is fair, it's reasonable, given all the circumstances.

It's a lot less than either of these parties would like for it to be, but what they would like for it to be hasn't produced a buyer.

So, the Court does approve the sale of the home for the contract price. So these parties can get on with their lives.

Upon our careful review of the record, we conclude that the evidence preponderates in favor of the trial court's findings. Husband argues that the trial court erred by relying on Wife's witnesses for assessment of the Property's market value. Husband maintains that he was the only witness to provide "competent testimony of the value of the property" and that the real estate agent's and auctioneer's estimates were inaccurately based on public response to insufficient marketing. We disagree.

-12-

Husband testified that he valued the Property in the amount of $1,700,000.00, basing this figure on the most recent tax appraisal in that amount. He stated that the last price he told Ms. Creel or Wife he would accept for the Property was $1,550,000.00. Husband acknowledged that during the two and one-half years immediately following the divorce in which he attempted to sell the Property, he received no offers. When questioned regarding what improvements he had made to the Property in the two years preceding trial, he said that all structures had new roofs, the tennis courts had been refurbished, decking had been replaced, the basement had been refinished, and a new heat pump and air conditioning unit had been installed. Husband indicated that he had spent approximately $150,000.00 maintaining the Property.

Ms. Creel testified that she was the owner of Keeler Williams Realty in Knoxville and was certified as a luxury home specialist, with a luxury home defined as one priced at $500,000.00 or more. She had been a realtor for twenty-four years and had listed and sold property in several East Tennessee counties. When questioned regarding her marketing methods since first listing the Property at issue in May 2011 through trial, she explained:

> Well, I had put it up on over 150 websites that are well recognized. Websites for marketing luxury homes and also homes. I've advertised it in Unique Homes, which is an international publication that goes out to about 50,000 luxury spas and hotels.
>
> I have marketed locally and placed it on the cover of several of our top magazines. Or several times in our top magazines. In Home Market that goes out with the News Sentinel. In a real estate book that goes out all over several counties. Homes, Knox Homes. And I have sent fliers to other agents, both by e-mail and mail out. I have mailed out cards, 4 by 6 cards.
>
> To geographic through Courthouse Retrieval System where I can mark people who own homes above $400,000.00, who might be potential clients. I have spoken with and discussed with agents not only in my office but in luxury, other luxury agents in the area.

Ms. Creel further explained that she had engaged a professional photographer to take both aerial and ground photographs of the Property. Wife presented into evidence a regional real estate brochure, dated January 2012, featuring a full-page color photograph of the Property on its cover.

Ms. Creel testified that she had shown the Property to potential buyers approximately ten times. She acknowledged that she had not held an open house, opining that an open

house would be ineffectual considering the remote location of the Property. She further indicated that she had not commissioned an appraisal of the Property.

Ms. Creel noted that obstacles to selling the Property included its entirely stucco composition, aging fixtures, and lack of readiness for high-definition television. She opined that the materials in the home were of high quality but were specific to the parties' desires and did not always appeal to buyers' tastes. She stated that during the time she was marketing the property, hail and other weather damage occurred that required repairs. She confirmed that Husband had successfully completed those repairs. According to Ms. Creel, the four-bedroom guest house on the Property was "in dire need of work" and something of "an eye sore." The guest house had been damaged by rental tenants, whom she believed were there upon Husband's permission but had vacated the Property by the time of trial. She mentioned that it was sometimes difficult to show the Property to potential buyers because Husband tended to "hover" and provide information that did not assist in marketing the Property.

Ms. Creel testified that the starting price when she began listing the Property was $1,600,000.00. As she related, Wife subsequently agreed to lower the price to $1,550,000.00, "where it stayed for a long time." According to Ms. Creel, potential buyers consistently told her the price was too high, and the only offer she received was the one at issue. Upon Ms. Creel's advice, Wife lowered the listed price to $1,250,000.00, and it was Ms. Creel's understanding that pursuant to the September 2011 court order, Wife had the authority to do so without consulting Husband. The listed price remained at $1,250,000.00 when Ms. Creel received the current potential purchasers' first offer. She explained that she did not present the offer or counter-offer at issue to Husband "[b]ecause he told me that he would not accept anything less than $1.5 and I knew that was unreasonable." When questioned regarding the potential for obtaining a higher price than $925,000.00 for the Property, Ms. Creel opined that the chances were "zero and none." She maintained that she had put forth her best effort as a real estate broker and had obtained the best possible offer.

Licensed real estate broker and auctioneer David Posey testified that he had been an auctioneer for six years and was employed as the chief auctioneer for Keeler Williams Realty and Posey Auctions. He stated that he was familiar with the Property and had shown it to a potential buyer approximately one year before trial. Mr. Posey opined that at auction the Property would not bring a price in excess of $925,000.00. In support of his opinion, he compared the Property to several differently situated properties in a comparable price range. He noted that sometimes "more structures that are on a property means more maintenance" and can hinder sales because potential buyers are worried regarding the cost of maintaining additional structures. He noted that although he did review the tax appraisal on the Property,

-14-

he typically finds tax appraisals not to be indicative of market value. He stated that in his experience, an auction will usually bring a purchase price less than the listed price.

In addition to considering the testimony, the trial court expressly considered the nearly eight years the Property had been on the market and the dearth of offers the parties had received in that time. The trial court, in its discretion, was free to place a value on the Property that was within the range of the evidence submitted. *See Wallace*, 733 S.W.2d at 107. We stress also that the trial court's determinations regarding witness credibility are entitled to great weight on appeal. *See Morrison*, 338 S.W.3d at 426; *Jones,* 92 S.W.3d at 838. We determine that the evidence does not preponderate against the trial court's finding that the proposed purchase price of $925,000.00 represented a reasonable market value for the Property.

Husband also argues that because the bulk of his interest in the marital estate was his interest in the Property at issue, sale of the Property at the amount approved by the trial court would result in an inequitable redistribution of marital assets contrary to the intent of the parties in executing the MDA. He asserts that the provision of the MDA awarding Wife "(30%) of the net proceeds or $460,000.00, whichever is greater" from the sale of the Property evinces the parties' belief at the time of the agreement's execution that $460,000.00 represented at least thirty percent of the Property's market value. As Wife notes, however, the MDA contains no estimated market value for the Property, nor does it provide a minimum sale price. In fact, the MDA provides for the eventuality that Wife's minimum share of $460,000.00 may be greater than thirty percent of the total net proceeds. *See Allmand v. Pavletic*, 292 S.W.3d 618, 630 (Tenn. 2009) ("Courts must look at the plain meaning of the words in a contract to determine the parties' intent. If the contractual language is clear and unambiguous, the literal meaning controls . . . .") (internal citations omitted).

Contrary to Husband's assertion that the trial court failed to consider the equitable distribution of the marital estate, our review of the record demonstrates that the court weighed carefully the effect of the failure to sell this Property on the distribution of the estate. As the court noted, Husband by the time of trial had resided on the Property nearly eight years since entry of the judgment for divorce without paying any rent. It is undisputed that Husband had repeatedly failed to pay taxes on the Property or maintain homeowner's insurance. In 2009, Wife acquired a loan at Husband's request to facilitate repair of the swimming pool liner, and this debt was still outstanding at time of trial in the amount of, including interest, $52,000.00. Upon the parties' December 2008 agreement, memorialized by the trial court in its September 2011 order, Wife obtained financing to pay outstanding property taxes and accompanying interest, an obligation that, pursuant to the MDA, had become Husband's responsibility at the time of the divorce judgment. Pursuant to the

December 2008 agreement, Husband was to repay Wife for this loan from his portion of the Property sale proceeds but had not done so by trial. Husband also does not dispute that the property taxes were again in arrearage by the time of trial. Moreover, pursuant to the trial court's June 2007 order, Wife's asset of the Eleanor Street Property was lost to her through Husband's failure to pay the mortgage regarding that property. By trial, Husband still had not paid Wife the $70,000.00 the trial court ordered him to pay in 2007 as replacement for the Eleanor Street Property.

As the trial court noted, "[t]he longer the house is not sold the greater the existing debt is," which "simply adds to the burden of these parties." The trial court did not err by approving the sale of the Property at the proposed purchase price of $925,000.00.

## V. Wife's Authority to Sell the Property and Duty of Good Faith

Husband contends that the trial court erred by finding that Wife acted with authority and good faith by marketing the Property and accepting the counter-offer of $925,000.00 without consulting Husband. Wife asserts that the trial court properly found that she was vested with the authority, pursuant to the order entered September 6, 2011, to act without Husband in marketing and selling the Property. She also argues that the trial court properly found that she had acted in good faith when she negotiated the purchase price of $925,000.00. We agree with Wife.

Husband asserts that it was not his intent upon entering the December 2008 agreement, memorialized in the trial court's December 2011 order, to authorize Wife to sell the Property without consulting him regarding the purchase price. As Husband notes, the parties' MDA originally provided Wife with the remedy of demanding an immediate auction of the Property "by a reputable auction company with a mutually agreeable reserve." He maintains that it was his intent for the stipulation of a mutually agreeable reserve to carry over into the agreed order and that he also intended for Wife to have authority only to market and list the Property. The trial court, however, found that in the plain language of the September 2011 order, Wife was vested with the authority to "list, market, show and sell" the Property. We agree. *See City of Shelbyville v. State ex rel. Bedford County*, 415 S.W.2d 139, 144 (Tenn. 1967) ("A consent decree is a contract made final and binding upon the parties by the approval of the court."); *see also Kafozi*, 184 S.W.3d at 698 ("The parties' intent is presumed to be that specifically expressed in the body of the contract.").

Husband also posits that Wife violated the covenant of good faith and fair dealing inherent in their MDA when she unilaterally agreed to sell the Property for what Husband believed was below its market value. *See Long*, 221 S.W.3d at 9 ("A marital dissolution agreement, like any other contract, contains an implied covenant of good faith and fair

dealing both in the performance and the interpretation of the contract."). Pursuant to the parties' MDA, Wife received at the time of the divorce judgment a secured interest in the Property of $460,000.00 or thirty percent of the eventual sale proceeds, whichever proved to be higher. The MDA further provided in pertinent part:

> At the time of any nonauction sale, after the payment of any expenses of said sale, the Wife shall receive (30%) of the net proceeds or $460,000.00, whichever is greater. Should the property require an auction, the parties shall divide the proceeds of the auction, after the payment of the expenses of the sale evenly between them.

Husband argues that because Wife will receive $460,000.00 from any non-auction sale of the Property yielding at least that amount in net proceeds, she entered the sale contract at issue without regard for the fact that Husband's share would be less than fifty percent once commissions were paid and would be further reduced by the amounts he owed for property taxes and to Wife for the amounts enumerated in her motion for approval of the sale.

Husband's argument is essentially grounded in his contention that the Property, given more extensive marketing or a fortuitous auction sale, would sell for a minimum of $1,550,000.00 at some point in the future. The trial court found Husband's valuation to be unrealistic based upon a preponderance of the evidence presented at trial, and upon our thorough and careful review of the record, we agree. The trial court expressly found in its ruling incorporated into the final order that Wife had "exercised good faith" in her attempts to list, market, show, and sell the Property. In subsequently denying Husband's motion to stay execution of the judgment pending appeal, the trial court further explained its findings as follows in pertinent part:

> There were two issues presented in the earlier hearing. One was whether or not Ms. Granoff had the authority on her own to sell without Court approval. The Court found she did. I gave her that authority in previous Orders. Orders which were not appealed. Orders which were part of this Court's record. She did come in and ask for Court approval out of abundance of caution.

-17-

I found that not only was the sale appropriate, it was the only sale. It was the only offer. It was the only deal out there some six years[3] after entering the Judgment of Divorce.

I did observe that Mr. Granoff has had the benefit of living in this property for all those years. Not only rent free but from the testimony he has not lived up to his obligations under the previous Court's Orders.

Consistently behind in payments on debts that affected the property. And now comes in wanting more rent free time in this home. I don't know that I've ever seen a case or had a case where one party frustrated the imposition of a Judgment more than Mr. Granoff has.

It was argued at that hearing that the sale was, the amount was inadequate. I again point out, this was the only contract. This is the only legitimate offer that has been made in six years. And the Court found that under all the facts and circumstances it was proper and should be done.

I understand that now that there's a, you know, a potential problem with this buyer in that, I'm told right now that this buyer has a condition of its own. That they have to sell their own home.

That does not affect the Court's findings and conclusions, even if that sale should not go through because of a problem with the buyer. Ms. Granoff does have, continues to have the full authority to sell this property without Mr. Granoff's approval.

Because of that, the Court denies the motion for a stay pending appeal. The evidence in this case was clear, compelling. As I say, Mr. Granoff has frustrated the carrying out of previous Orders of the Court, caused both parties to incur additional debt.

As the trial court noted, the record is replete with instances of Husband's failing to pay Wife as ordered by the court and causing the parties to incur debt through his failure to pay property taxes and loan installments. When questioned at trial regarding whose interest she was protecting when she entered the purchase and sale contract at issue, Wife stated:

---

[3]In its final order, the trial court correctly found that the time period between the entry of the judgment for divorce in May 2006 and the instant final order in October 2013 was close to eight years. The mention of "six years" here appears to be a clerical error.

I have . . . in the beginning . . . I have to protect my interests but I have of our interests. I think this sale would bring a price and money that we could both split, okay. More than continuing on for eight more years. [Husband's counsel], I cannot afford that. I am paying a mortgage on my house, paid taxes on the house that Mr. Granoff and his wife are living in.

I borrowed money to fix the pool that at the end of the day is costing me. I'm just asking for both of us. I'm not trying and never have tried to hurt Mr. Granoff.

Husband argues that a more equitable remedy, provided to Wife in the MDA, would have been to auction the Property at a mutually agreeable reserve price to then be split equally between the parties. Wife testified, however, that once she had obtained the June 2007 order authorizing an auction, Husband refused to entertain a reserve price of less than $1,700,000.00. Both Ms. Creel and Mr. Posey testified that if the Property were sold at auction, it was likely to be for an amount within the range of the amount at issue, $925,000.00, or less.

When questioned regarding how he anticipated Wife's receiving the funds due her if the Property were not sold, Husband opined that when he turned sixty-two in May 2014, he could obtain a reverse mortgage in the amount of $390,000.00 and pay Wife then. Setting aside, *arguendo*, the speculative nature of this plan, Husband failed to account for the gap between the amount he anticipated receiving from a reverse mortgage and the amount actually owed to Wife. We conclude that the trial court did not err by finding that Wife was vested with the sole authority to enter into a purchase and sale contract. We further conclude that the evidence does not preponderate against the trial court's finding that in exercising said authority, Wife did not breach the covenant of good faith and fair dealing.

## VI. Protection of the Marital Estate

Husband further argues that the trial court failed to protect the value of the Property when it authorized Wife to execute the sale without imposing further conditions to ensure that she would obtain fair market value for the Property. *See* Tenn. Code Ann. § 36-4-121(a)(3) (2014) (providing that within the context of a court-ordered sale, a court "in its discretion, may impose any additional conditions or procedures upon the sale of property in divorce cases as are reasonably designed to ensure that such property is sold for its fair market value."). In support of this argument, Husband relies on this Court's decision in *Doran v. Doran*, No. W2003-00170-COA-R3-CV, 2004 WL 86174 (Tenn. Ct. App. Jan. 12, 2004). In *Doran*, the trial court had ordered the sale of four parcels of real property belonging to the divorcing parties as tenants in common. 2004 WL 86174 at *1. The *Doran*

trial court directed the parties to submit sealed bids to purchase each other's interest in each parcel and ordered that the party with the winning bid for each parcel would be awarded outright ownership of that parcel. *Id.* This Court held that although the trial court was "well within its authority, as granted by Tenn. Code Ann. § 36-4-121, to order a private sale," the trial court failed to comply with the statute because it failed to "'ensure that such [marital] property is sold for its fair market value.'" *Id.* at *2-3 (quoting Tenn. Code Ann. § 36-4-121(a)(3)(C)). We find *Doran* to be factually distinguishable from this case. First, as Husband acknowledges, the trial court in the instant action did not order a private or public sale of the Property pursuant to Tennessee Code Annotated § 36-4-121(a)(3). Second, the trial court in this case accepted the proposed purchase price of $925,000.00 as a reasonable value based upon expert testimony rather than accepting blind bids from the parties.

We conclude that based upon the sole authority vested in Wife to convey the Property by the December 2011 agreed order and a preponderance of the evidence that Wife exercised this authority in good faith, the trial court did not err in vesting continued sole authority in Wife to convey the Property.

## VII. Conclusion

For the reasons stated above, the trial court's grant of Wife's motion to approve the sale of the Property, inclusive of the court's vesting of sole authority in Wife to convey the Property by her signature, is affirmed. Costs on appeal are taxed to the appellant, Andrew Scott Granoff. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and collection of costs assessed below.

_____
THOMAS R. FRIERSON, II, JUDGE